**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KELLI L. MINGER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 4696 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Kelli Minger seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. §1382c(3)(A). Ms. Minger filed her application for benefits on January 15, 2014. She claimed she has been unable to work since February 2002 due to migraines, ADHD, depression, and joint pain. (Administrative Record (R.), 225, 312). Over the course of the ensuing three years and three months, Ms. Minger's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Ms. Minger filed suit under 42 USC § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c). Ms. Minger asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.**

Ms. Minger comes to federal court having amassed a medical record of more than 500 pages

of medical treatment, in the main for psychological impairments. Treatment has included a few multi-day, partial psychiatric hospitalizations for symptoms ranging from suicidal ideation to wanting to hurt her baby. (R. 339, 348, 350-53). Ms. Minger has a sporadic work history, with brief periods of employment at mostly fast food emporiums; places like Burger King, Steak and Shake, Jamba Juice, and the like. For one reason or another – altercations with fellow employees, absenteeism, pregnancy, whatever – these jobs were short-lived. (52-58, 64-65). At the time of her hearing, she was on suspension from a house-cleaning job after a set of reindeer antlers went missing. (R. 66-68). She was also homeless, living in her car, and had given up care of her two children to her mother. (R. 73, 77-78). Her mother thought she was just lazy, but Ms. Minger's treating psychologist explained that her daughter had "several significant mental illnesses and that some of what her mother views as [Ms. Minger] being lazy is more related to her mental illnesses . . . ." (R. 674).

After an administrative hearing – at which Ms. Minger, represented by counsel, and a vocational expert testified – the ALJ determined she was not disabled. He started off on the wrong foot, by asserting that Ms. Minger claimed she was disabled from birth (R. 23, 50). That's not the case; she clearly claimed her disability began on February 1, 2002. (R. 225). It's unclear whether this error played a role in how the ALJ thought about Ms. Minger's claim. In any event, the ALJ went on to find that Ms. Minger had a number of severe impairments: bipolar disorder, panic disorder, attention deficit hyperactivity disorder, and borderline personality disorder. (R. 25). These mental impairments resulted in moderate restrictions in social functioning and maintaining concentration, persistence, and pace, and a mild restriction on daily activities. (R. 29). The ALJ found that a number of other impairments – migraines, obesity, asthma, and sacroiliitis – were not

severe. (R. 26-28). None of Ms. Minger's impairments, singly or in combination, amounted to a condition that met or equaled an impairment assumed to be disabling in the Commissioner's listings. (R. 28).

The ALJ then determined that Ms. Minger had no physical limitations on her ability to work, meaning she could perform even very heavy work requiring her to lift more than 100 pounds at a time and frequently lift and carry over 50 pounds at a time. (R. 31); 20 CFR §416.967. But, given Ms. Minger's mental impairments, the ALJ found her limited to work that involved only "simple tasks in a goal-oriented environment where she would not be subject to fast-paces production rate requirements." (R. 31). She was also limited to no more than occasional interaction with the public, co-workers, and supervisors. (R. 41). Her non-severe impairments imposed no additional limitations on her ability to work. (R. 35). The ALJ also found that Ms. Minger's allegations about the effect her symptoms had on her ability to work, and the extent of those effects, were not entirely consistent with the medical evidence. In addition, her allegations were undermined by her poor work record, her ability to work despite being allegedly disabled, her ability to perform limited daily activities, and the fact that she was six months pregnant at the time of her application (R. 33-34).

Relying on the testimony of the vocational expert from the administrative hearing, the ALJ determined that plaintiff could perform work that exists in significant numbers in the national economy: cleaner II (Dictionary of Occupational Titles (DOT) 919.687-014), industrial cleaner (DOT 381.687-018), and laboratory equipment cleaner (DOT 381.687-022). (R. 36). As a result, the ALJ concluded that Ms. Minger was not disabled and not entitled to SSI. (R. 37).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must

uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017)

But, in the Seventh Circuit, the ALJ also has an obligation to build what Judge Posner called a "logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). The court must be able to trace the path of the ALJ's reasoning from the evidence to the conclusion. Even if the court agrees with the result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)("we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").[1]

---

[1] The phrase (and the reasoning) was first used in a Social Security case in Judge Posner's Opinion in *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996). It appeared, however, earlier in Judge Robinson's Opinion for the court in the non-Social Security case of *Thompson v. Clifford*, 408 F.2d 154 (D.C.Cir. 1968), which said "'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." 408 F.2d at 167.

**III.**

We begin with problems that were raised earlier in the court's initial review of the record. Ms. Minger is obese and, more recently, morbidly obese. (R. 28, 358, 507). As was noted in the initial review, the ALJ felt this was not a severe impairment, which is at least a questionable characterization as non-severe impairment is a designation reserved for "de minimis" impairments or "slight abnormalities that only minimally impact a claimant's basic work activities." *O'Connor–Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016). Along with obesity, the ALJ also dismissed Ms. Minger's migraines[2], asthma, and sacroiliitis as non-severe, and determined they had absolutely no adverse effect on her ability to work. (R. 26-28). Setting aside for the moment the migraines and the asthma, the objective medical evidence shows that Ms. Minger has mild disc space narrowing at L5-S1 (R. 732), has been prescribed muscle relaxers and narcotics like Tramadol for pain (R. 33), *cf. Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir.2004) (physicians' prescription of strong pain medications substantiated claimant's pain allegations), and has undergone injections. (R. 83). Juxtapose the obesity and the back impairment and pain against the ALJ's determination that Ms. Mingle can perform heavy work, and the ALJ's "logical" bridge crumbles. It certainly seems illogical.

---

[2] In response to the initial review order of October 20, 2017, the Commissioner asserted, in the hopes of distinguishing *Moon v. Colvin*, 763 F.3d 718 (7th Cir. 2014), that unlike *Moon*, "[t]his case does not features [sic] allegations of headaches." [Dkt. #16, at 7]. Yet, it could not be clearer that allegations of headaches are, indeed, a feature of this case. The ALJ spent at least a paragraph discussing Ms. Mingle's allegations of migraine headaches. (R. 26). Specifically, Ms. Mingle alleged that she suffered from migraines 15 to 20 days a month. (R. 93). This tends to call into question the rigor with which the Commissioner reviews these cases before proceeding with her defense. *Cf. Farley v. Berryhill*, 17 C 6981 (N.D.Ill.) [Dkt. #18, Commissioner's Statement in Compliance ("According to the court, it issues such orders because the Commissioner's attorneys lack the professionalism to "assess the strength of their" litigation position prior to filing briefs before this court. . . . The Commissioner wishes to reassure this court that her attorneys are ethical practitioners who are acutely aware of their responsibilities to their client and the court to avoid taking frivolous litigation positions.")].

Throw in migraines and asthma and the ALJ's finding that these impairments have absolutely no effect on Ms. Mingle's ability to work, even in combination, and that bridge gets even shakier. *See Murphy v. Colvin*, 759 F.3d 811, 817–18 (7th Cir. 2014)("In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, 'even [limitations] that are not severe, . . . ."); *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014)(ALJ must consider the effect of both non-severe and severe impairments in combination); SSR 96-8P ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim.").

Then there is the ALJ's attempt to account for Ms. Minger's moderate limitation on her ability to maintain concentration, persistence, and pace with a restriction to "simple tasks . . . where she would not be subject to fast-paced production requirements." (R. 31). This issue was raised in both the initial review order and Ms. Minger's brief. As the initial review order pointed out, the Seventh Circuit is on record that there is no authority, and that it is no more than speculation, "that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including, as part of the claimant's mental residual functional capacity, a *moderate* limitation on concentration, persistence, and pace." *O'Connor–Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016)(emphasis supplied); [Dkt. #12, at 4]. Despite *O'Connor–Spinner*, the Commissioner addressed the ALJ's finding like this:

> But the ALJ in *O'Connor-Spinner* did not find moderate concentration, persistence or pace limitations in that case – he found mild limitations, and referenced only a hypothetical RFC if the claimant had instead suffered moderate limitations. Notably,

6

> the ALJ made no effort in that case to explain the support for an RFC finding he never made to accommodate moderate limitations he never found.
>
> In this matter, the ALJ found moderate limitations and gave a detailed rationale, including multiple reference [sic] to records from and findings by treating and examining medical sources, supporting his RFC finding.

[Dkt. # 16, at 9]. Again, the Seventh Circuit, in the passage quoted in the initial review order, is clearly discussing a *moderate* limitation – like the one the ALJ found here – and the fact that a restriction to work without fast-paced production quotas – like the one the ALJ applied here – fails to account for it. So, it's not clear at all why the Commissioner thinks it's fine in this case. The Seventh Circuit is clearly harkening back to its more than seven-year-old word to the wise in the original *O'Connor-Spinner* decision that "the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). There's no authority to show that "no fast-paced quotas" eliminates jobs, in a VE's mind, that cannot be performed by someone with a moderate limitation on concentration. After, the ALJ didn't provide the VE with anything like what the Commissioner calls "a detailed rationale, including multiple reference to records from and findings by treating and examining medical sources."

To illustrate the limitations of the ALJ's "no fast-paced production" limitation, let's say, for the sake of argument, that a laboratory equipment cleaner is not subject to any fast-paced production quota. One can see how telling the VE to eliminate work with fast-paced production quotas might, in some cases, account for a problem with maintaining pace, if that terms were defined; more on that later. In any event, here, the VE thought a person who couldn't handle a fast-paced production quota could still be a laboratory equipment cleaner. But, given that the tasks a laboratory equipment

7

cleaner must perform include cleaning delicate equipment like glassware, slides, and instruments, *see* https://occupationalinfo.org/38/381687022.html, it would seem that a worker, while perhaps not having to work at a fast pace, would still have to maintain a high level of concentration and care on a regular basis. So, telling the VE to rule out fast-paced production quotas doesn't account for a problem with concentration – at least it didn't in this case. But, again, that's because the ALJ never informed the VE that Ms. Mingle had any trouble concentrating.

And then there is the question of just what the ALJ meant by "fast-paced production requirements." He didn't define the term. The Seventh Circuit has called this "problematic" and explained that "[w]ithout such a definition, it would have been impossible for the VE to assess whether a person with [plaintiff's] limitations could maintain the pace proposed." *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015).[3] As such, there are a number of gaps in the logical bridge here, and a remand is necessary to fill them in.

Ms. Minger also finds several faults with the ALJ's credibility finding – as of March 28, 2016, referred to as "Evaluating the intensity and persistence of the claimant's symptoms." SSR 16p-3; *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). First, there is the ALJ's use of the boilerplate paragraph:

---

[3] New regulations, effective March 2017 – well after the ALJ's decision in this case – describe a moderate limitation as meaning a plaintiff's functioning in the particular area is "fair." According to the Commissioner's discussion of the new definition, it is not a change, but "consistent with how [ALJs] have understood and used those words in our program since we first introduced the rating scale in 1985." Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01, 66147. That means "fair" continues to represent a broad spectrum of functioning, "rang[ing] from limitations that may be close to "marked" in severity to limitations that may be close to the "mild" level." Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01, 66146. Whether "moderate" or "fair", or tending toward "marked" or "mild" an ALJ still has to inform a VE of the level of functioning of a plaintiff in order for a VE to testify about what kind of jobs that plaintiff can do.

8

> I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statement s concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(R. 32). It is, as Ms. Minger notes, yet another example of the continuous, confusing and meaningless boilerplate that is all too common in these decisions and that stubbornly persists in spite of the efforts of the Court of Appeals. *See, e.g., Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016)(deriding "the ALJ's use of language that this court routinely has condemned as 'meaningless boilerplate' and 'backwards' analysis."); *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)("The present 'template,' . . . is even worse . . . ."); *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011)("There is no explanation of which of [claimant's] statements are not entirely credible or how credible or noncredible any of them are."); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)("It is not only boilerplate; it is meaningless boilerplate.").

Sadly, this current example doesn't even match what the Commissioner's own regulations say the standard for evaluating allegations about symptoms is: that the ALJ must determine whether those allegations "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §416.929(a). That, as Ms. Minger contends, is clearly a different, and a not as rigorous, a standard than the ALJ's demanded in this case, namely that allegations be "entirely consistent" with the medical and other evidence. If ALJs really want boilerplate paragraphs in their opinions so badly, why not simply echo the regulatory language? *Cf. Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)("The government regards the 'template' as an indispensable aid to the Social Security Administration's overworked administrative law judges. Yet when we asked the government's lawyer at argument what the 'template'" means, he confessed he did not know.").

9

The Commissioner doesn't bother to address this trouble with the ALJ's opinion in her brief; instead, she couches her own arguments in the "entirely consistent" standard as opposed to the applicable one. [Dkt. # 20, at 3]. That is a foolish tactic and generally a fatal one. *See Law v. Medco Research, Inc.*, 113 F.3d 781, 787 (7th Cir. 1997 ); *Tomczyk v. Blue Cross & Blue Shield United of Wisconsin*, 951 F.2d 771, 778 -779 (7th Cir. 1991). Thus, for the Commissioner, it is enough that the ALJ went on to discuss why he didn't believe Ms. Mingle's allegations, relying on a line of cases exemplified by *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013). *Pepper* criticized a previous edition of meaningless ALJ boilerplate, but found its inclusion in an opinion was not a fatal flaw as long as the ALJ pointed to evidence that justified his credibility determination. 712 F.3d at 367-68. But the previous boilerplate was different than this version, stating that the claimant's statements were not credible to the extent they were inconsistent with the ALJ's RFC determination. The problem with it was that it put the cart before the horse, indicating that the ALJ arrived at his RFC determination without considering the claimant's symptoms. *Moore v. Colvin*, 743 F.3d 1118, 1122 (7th Cir. 2014). As such, if the ALJ went on to discuss the claimant's symptoms and his assessment of them, the inclusion of the boilerplate was harmless. Here, however, the ALJ's boilerplate indicates that he will be assessing the claimant's symptoms under a different standard – "entirely consistent" – than required in the regulations – "reasonably . . . accept[able] as consistent." As a result, the discussion following the boilerplate doesn't rescue the opinion, because the ALJ might be applying the wrong standard in that discussion. Unfortunately, the Commissioner either missed this point or, perhaps, simply thought better of attempting to defend the new "template." But as we have said that is an unproductive tactic.

In considering Ms. Minger's daily activities, the ALJ said that "one cannot ignore that [Ms. Minger] has displayed a routine that would be compatible with and indicate an ability to maintain a routine schedule inherently required of substantial gainful activity." (R. 32). Yet, at the same time, the ALJ said he was aware that Seventh Circuit case law states that ALJs may not equate one's daily activities to performance of substantial gainful activity. (R. 32)); *see, e.g., Bjornson*, 671 F.3d at 647("The failure to recognize [the] differences [between activities of daily living and activities of a full-time job] is a recurrent . . . feature of opinions by administrative law judges in social security disability cases."). This contradiction is neglected by the Commissioner in her brief and her statement in compliance with the order of October 20, 2017. [Dkt. #16, at 10; #20, at 5].

But there are issues with the ALJ's consideration of Ms. Mingle's activities – they hardly qualify as "daily" as we shall see – that go beyond that. What an ALJ can do in reference to a claimant's daily activities is explain why those activities are inconsistent with the claimant's allegations of limitations. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). Ms. Mingle's activities, which are significantly limited and sporadic, are not. And they don't, contrary to what the ALJ says, display a routine compatible with maintaining a schedule required of work. As the ALJ says, Ms. Minger shops (R. 32), but the ALJ doesn't concede that she only shops once or twice a month. (R. 277, 315). As the ALJ says, she can prepare simple meals (R. 32), but the ALJ ignores the fact that she can do that only sometimes, depending on how depressed she is. (R. 276, 314).[4] She may fold clothes and sweep the floor (R. 32), but only once or twice a week, and she requires help to do it and reminders to do it as well. (R. 276). What about the fact that Ms. Minger can't take care of her children and, more to the ALJ's interest in household chores, leaves dirty diapers on her

---

4

mother's couch and strewn around her son's room? (R. 674). The ALJ improperly (and mystifyingly) ignored the fact that the few activities Ms. Minger did manage to undertake were done with significant limitations and often done quite ineffectively. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).[5] Ms. Mingle also specifically stated that her depression limited her ability to cook meals, but the ALJ used this symptom-limited activity as evidence that Ms. Mingle's symptoms weren't as bad as she claimed. There's not even a thread of logic there, let alone a bridge.

The ALJ also pointed to Ms. Minger's sporadic work record as support for rejecting Ms. Minger's allegations about her symptoms and limitations. There are certainly any number of SSI applicants with no, or only a passing, familiarity with the demands of work, so, in some cases, it's understandable that an ALJ might wonder how an applicant could credibly allege that she was unable to work when the applicant had no experience with it. Here, the record certainly indicates that Ms. Minger doesn't hold onto jobs very long, but does it logically support the ALJ's assessment that she's simply not motivated? (R. 32). There is a report from Ms. Minger's treating psychologist that places the blame for Ms. Minger's poor work history at the door of her mental illness. In July of 2015, Dr. Brucker met with Ms. Minger and her mother and wrote:

> Her mother has again told her she has to move out of the house due to her disrespectful and rude behavior towards her and others in the house. Her mother continues to have problems with Kelli's lack of helping out around the house as much as her mother would like her to help out and to the quality level her mother would like. . . . I also spoke with her mother about the fact that *Kelli has several*

---

[5] In his assessment of Ms. Minger's activities and how they undermined her allegations about her symptoms, the ALJ also noted that "at the time the claimant filed her application for benefits she was six months pregnant. The claimant delivered on April 25, 2014 by Caesarean section. (R. 32). One can only guess what the ALJ might have been driving at here, but without any explanation, it's no support for a rejection of Ms. Mingle's allegations. *Cf. Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017)("Nor is any inconsistency obvious, so the ALJ did not substantiate the finding that [plaintiff's] daily activities reveal any exaggeration of [plaintiff's] limitations.").

12

> *significant mental illnesses and that some of what her mother views as Kelli being lazy is more related to her mental illnesses and not her being lazy*. Her mother is going to be getting involved in the local NAMI and that should help her gain a better understanding of Kelli's symptoms and what to expect. Kelli is medication compliant with the medications she has available.

(R. 674)(emphasis supplied).

While the ALJ discussed a few of Dr. Brucker's findings, this one – significant as it relates to the adverse effect Ms. Minger's mental illness has on her capacity to hold down a job – was not. The ALJ's assessment that Ms. Minger's problem is not mental illness but lack of motivation smacks of the ALJ playing psychologist, which he is not allowed to do. *See, e.g., Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir. 2014)(ALJ improperly made his own psychological assessment of the plaintiff); *Rohan v. Chater*, 98 F.3d 966, 970–71 (7th Cir. 1996). The ALJ could have rejected Dr. Brucker's report, but he would have had to provide good reasons for doing so. *Brown v. Colvin*, 845F.3d 247, 252 (7th Cir. 2016); *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016). He didn't.

## CONCLUSION

For the foregoing reasons, this case is remanded to the Commissioner for further proceeding consistent with this opinion, and the defendant's motion for an affirmance of the ALJ's decision [Dkt. #19] is DENIED.[6]

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 4/20/18

---

[6] Plaintiff asks that the ALJ's decision be reversed and an award of benefits ordered. [Dkt. #18, at 16]. "It remains true that an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Allord v. Astrue*, 631 F.3d 411, 417 (7th Cir. 2011). As the remand here comes under the Seventh Circuit's "logical bridge" requirement, an award of benefits is not appropriate without further administrative proceedings.